## Dave Smith v. The State.

### No. 4145.    Decided January 15th, 1908.

**1.—Rape—Change of Venue—Compurgators.**

Upon trial for rape, where there were no compurgators in connection with the motion for change of venue, it was not incumbent on the court to consider the same.  However, the motion was correctly overruled.

**2.—Same—Copy of Indictment—Service—Name of Defendant.**

In a motion to quash an indictment on account of misspelling of defendant's name, the same was simply a suggestion how the name should have been spelled. If it was a motion to quash the service of a copy of the indictment, and the original indictment showed that the defendant's name could be correctly read as alleged, there was no error.

**3.—Same—Cross-Examination—Evidence.**

Upon trial for rape, there was no error to permit the State's witness on re-examination, after a rigid cross-examination, to affirm the truthfulness of the witness' examination in chief.

**4.—Same—Evidence—Conduct of Witness.**

Upon trial for rape, there was no error to permit the State's counsel to ask prosecutrix if after she told her husband about the way defendant had treated her, she ceased to laugh and joke with him.

**5.—Same—Evidence —Outcry.**

Upon trial for rape, there was no error to permit prosecutrix to testify that the reason that she did not cry out at the time of the offense was that she was afraid defendant would whip her; witness being of tender years, and under the subjection of defendant's will.

**6.—Same—Evidence—Defendant's Declaration.**

Upon trial for rape, there was no error in admitting in evidence defendant's declaration to prosecutrix, as to what she should do to prevent conception.

**7.—Same—Declaration of Third Party.**

Upon trial for rape, there was no error in admitting the testimony of prosecutrix' husband that the reason for his questioning her in regard to the offense, was that he found that his wife was not a virgin, after marrying her.

**8.—Same—Declaration of Third Party—Cross-Examination.**

Where upon trial for rape, the declarations of a third party might not have been wholly relevant testimony, to wit: as to what he advised prosecutrix's husband to do, yet where the same was brought out by the defense, as stated in the trial court's explanation, there was no reversible error.

**9.—Same—Evidence—Motive of Witness.**

Where upon trial for rape, a certain letter written by prosecutrix' husband was in evidence, calling on defendant to convey his land to them and leave the country, there was no error in permitting said husband, after he was rigidly cross-examined by the defense, to testify upon re-examination by the State, that said letter was written not for the purpose of extortion, but as a means of reconciliation.

**10.—Same—Declaration by Defendant.**

Upon trial for rape there was no error in admitting the statement of defendant when he was not under arrest, and which he made to a brother Mason, to the effect that he wanted the matter investigated, upon ·the question as to whether he was guilty of the offense or not.

**11.—Same—Evidence—Rebuttal—Conduct of Witness.**

Where upon trial for rape the defense sought to show by prosecutrix on cross-examination that when she first told her husband of the assault by defendant,

that she was laughing and joking, there was no error in permitting her to state on re-examination that at another time and place she and her husband were crying, when defendant approached them; besides, this character of testimony, was harmless, if error.

**12.—Same—Misconduct of Jury—Allusion to Former Conviction.**

Upon trial for rape where it appeared on motion for new trial, that the discussion among the jurors with reference to defendant's former conviction was only incidental and inured to the benefit of defendant, there was no error.

**13.—Same—The True Rule.**

The true rule is that where, as in this case, the testimony supports the verdict, and the charge of the court properly submits the case to the jury, that a verdict ought not to be set aside for every incidental and casual mention of a former trial or a former conviction, and that in no case should it be set aside in a case tried according to law where the conviction is supported by the testimony, unless in the light of all of the circumstances such reference might have prejudiced the defendant.

Appeal from the District Court of Wood. Tried below before the Hon. R. W. Simpson.

Appeal from a conviction of rape; penalty, imprisonment in the penitentiary for life.

The explanation of the court to defendant's bills of exception numbers 7 and 8, with reference to the statement of Jeff Tedley to the husband of prosecutrix, B. B. Culpepper, is as follows:

"Witness had not been asked upon his direct examination by the State anything about the conversation with Tedley; and defendant on cross-examination interrogated the witness about what he had said to Tedley, and Tedley to him, among other questions witness was asked by defendant's counsel on cross-examination: 'Now, when you went down to Tedley's and staid all night of the day you were told by your wife in the pea patch that defendant had had intercourse with her, didn't you tell Tedley of what your wife had told you?' Witness answered, 'yes.' If he, Tedley didn't tell you about a trade he had made about a buggy and didn't you reply, 'I have a better thing than that. I have a scheme to make a thousand dollars?' to which witness replied, 'No, Tedley was the first man to suggest that I make a proposition to defendant; I had not at that time thought of making a proposition.'

"'What did Tedley say?' Witness replied, 'He said go and make defendant deed you the Poe Place, and rent it to me next year, he will do it.' Now he refused to do so, and you deeded your wife's interest in her mother's estate to Mounts & Jones to prosecute him?' Witness replied, 'Yes, wife and I did.'"

After the above examination by the defendant, the State upon redirect examination asked the question, and the witness replied as is set out in said bills of exception.

The opinion states the case.

*M. D. Carlock,* for appellant.—On question of misconduct of jury: Long v. State, 32 Texas Crim. Rep., 140; Gilliland v. State, 44 Texas, 364; Casey v. State, 51 Texas Crim. Rep., 433, 19 Texas Ct. Rep., 351; Horn v. State, 50 Texas Crim. Rep., 404, 97 S. W. Rep., 822.

*F. J. McCord,* Assistant Attorney-General, for the State.—Upon question of defendant's declaration to a brother Mason: Williford v. State, 36 Texas Crim. Rep., 414; Bookser v. State, 26 Texas Crim. App., 593; Kelly v. State, 37 Texas Crim. Rep., 641; Guinn v. State, 39 Texas Crim. Rep., 257.

RAMSEY, Judge.—Appellant was convicted of rape of his daughter, and his punishment assessed by the jury at imprisonment in the penitentiary for life.

The case was before this court on former appeal, and was reversed, 49 Texas Crim. Rep., 174, 100 S. W. Rep., 924. The facts are essentially the same on the present trial as on the former appeal, and no good or useful purpose could be served by a repetition of the horrible details of the crime alleged.

Appellant made a motion for a change of venue on the ground of prejudice and a formidable combination adverse to him in the county where he was being tried. There were no compurgators in connection with the motion, and it was not incumbent on the court to consider same. However, the court did entertain the motion which was contested by the State and heard proof on the subject. The court overruled the motion, and we think correctly.

A motion was made to quash the service of a copy of the indictment which was served on appellant, or to quash the indictment itself (it is difficult to understand which) on the ground that the indictment charged that "Dove" Smith committed the offense and the copy served on appellant showed that it was Dave Smith. The court certified that, in his opinion, the pleader, while not making a plain "a" in spelling the word "Dave," the same could be read "a" so as to make it "Dave" Smith. At first it looks very much like an "o" but in subsequent allegations it appears more like an "a," and as the court states, could be so read without doing violence to the chirography. If this be considered as a motion to quash the indictment, we do not think it is well taken, even if it be conceded that the pleader alleged "Dove" instead of "Dave." This would merely amount to a suggestion that the name of appellant is given in the indictment was wrong, and that it should have been Dave. If it was a motion to quash the service of a copy, we believe the court's explanation was sufficient. He stated that he read it Dave. An inspection of the original indictment shows that it can be read "Dave," and we should be inclined so to read it, and the court below did not err in so holding.

We think, under the circumstances, it was allowable on re-examination by the State to prove by the witness Sadie Culpepper that she was not testifying for the land but telling the truth. She had been rigidly cross-examined about her participation in writing the letter to appellant in regard to his surrendering the land, and leaving the country, and on re-examination the State sought to prove and was permitted to prove by her that she was not testifying for the land. This was but

another way of permitting the witness to affirm the truthfulness of the statement made by her. It was also allowable to ask this witness if after she told her husband about the way her father had done her, she ceased to laugh and joke with him. We also believe it was allowable, under the circumstances, to prove by the witness Sadie Culpepper that she did not cry out on the night her father copulated with her, because she was afraid he would whip her. Considering the tender years of the prosecuting witness, her subjection to her father's will, this testimony does not seem objectionable. Nor do we believe it was error to permit the State to prove, under the circumstances, what her father said to her after the completion of the connection as to what she should do to prevent conception.

It was also permissible to prove by the witness B. B. Culpepper that he found, after sleeping with his wife, that she was not a virgin, as a reason for his questioning her in regard to the matter. It may be questioned whether it was wholly relevant or material to prove by the witness Tedley that he had advised Culpepper, husband of prosecutrix, to take appellant's land and settle the outrage in that way, and that it would be best for the family to keep down disgrace, etc. But as explained by the court as to how this testimony was elicited, we do not believe it was reversible error. We also believe, as explained by the court, that it was competent to ask the witness Culpepper whether he wrote the letter to get the defendant's property, or for some other motive, eliciting a reply from him, "It was done to save disgrace and exposure of his wife and for the good of the defendant and the children and that was the only motive." The court explains how this matter came up in the re-examination of the witness Culpepper, after he had been rigidly cross-examined in regard to said letter, demanding said land of appellant, and imputing by necessary implication a conspiracy or purpose on his part to extort a conveyance of appellant's land to prosecutrix. We, therefore, believe and hold that, under the circumstances, it was competent to prove by the witness Culpepper that he wrote the letter not for the purpose of getting the old man's land as the price of his silence, but as a means of reconciliation and to avoid trouble. The court explains that in the cross-examination of said witness, appellant sought by various questions to show that writing the letter was a blackmailing scheme in order to get appellant's land, and that he permitted the cross-examination of the witness under the circumstances in order to show the witness' motives.

We also hold that it was competent to prove by the witness, G. M. Houston, as was done, that he approached appellant as a Mason and asked him to tell him upon his honor as a Mason, if he was guilty of the offense charged against him; that he told him if he was not guilty to tell him, and if it was true, he did not expect him to answer; but if he was not guilty to say so; and that appellant replied, "I want it investigated." This was a statement made by appellant when he was not under arrest, and the fact that Houston approached him as a Mason,

should not exclude the testimony. Whatever their relation of friendship or fraternal association might be, the rule upon which the statement should be admitted is not changed. The statement could be used by the State or defendant, for whatever it was worth, either party or the jury drawing their own conclusion from it.

The State was also permitted to prove by the witness Sadie Culpepper that when her father returned from his visit to his brother Newt Smith, at Winnsboro, that he came back home on Thursday evening and that she and her husband were at home when he came. The State was then permitted to prove that at the time her father came home, she was sitting in her husband's lap, and they were both crying. This testimony was most strenuously objected to, and the objection is strongly urged by appellant's counsel in their brief. In passing on the objection it should be stated that it was sought to be shown on cross-examination of the prosecuting witness by strict and vigorous cross-examination that when she first told her husband of the assault by her father that she was in the pea patch, and that she and her husband were both laughing and joking, seeking in this way and by such demeanor to discredit the statement of the prosecuting witness, in that her deportment was wholly inconsistent and at variance with the natural conduct to be expected from one who had been so cruelly outraged and abused. Again, it was sought to be shown, and the imputation against both prosecuting witness and her husband was made, that the accusation against appellant was a scheme of blackmail, and in pursuance and furtherance of an effort to compel appellant to deed certain lands to his daughter. With the defense so made, and in view of this testimony, it seems to us that it was wholly proper to show by any one who might attest the fact that after the outrage and the time when such information was imparted to her husband, that the conduct of the prosecuting witness and her husband was not inconsistent with what might reasonably be expected of persons so circumstanced. Besides, it was testified by appellant that when the witness Culpepper first approached him in respect to a wrong done his then wife, that Culpepper commenced crying. This testimony was given on appellant's direct examination and presumably in response to questions asked by his own counsel. We cannot, therefore, concede that the testimony objected to was inadmissible; besides, we think that in view of the testimony on the subject adduced by appellant without objection, that the matter complained of could not in any event be deemed material, even if it be conceded that it was improperly admitted.

The only other substantial question raised is as to the misconduct of the jury in discussing the former conviction of appellant. In order that this matter may fairly appear, we quote all the testimony adduced on this subject, as follows:

"Mr. Wm. Rose, being duly sworn and introduced by defendant, testified as follows: I was a member of the jury that tried Dave Smith. The charge was given us in the case about 9 o'clock Wednesday night

and we returned a verdict in court in the case about 9 o'clock Friday morning.

"Q. Mr. Rose, after the jury retired to consider of their verdict in that case, was there any discussion of a former trial of the defendant, and was there anything said about him having been convicted by another jury? A. There was no discussion of a former trial, but the fact of him having been tried by another jury was mentioned in the jury room. I think it was mentioned several times, but the first I heard it mentioned, I think, was yesterday evening (Thursday). I think that Mr. Brock was the first man that mentioned it, and at the time I first heard it mentioned there were ten men of the jury in favor of a life sentence in the penitentiary, and two for death penalty. Q. How were you divided when you first went out to consider your verdict? A. Five and seven, five for death and seven for life or from twenty-five or thirty years; but said that they would not hang the jury either way, and would agree to life term if it would reach a verdict. One of the seven, Mr. Harpole, was for thirty years; and one, I think Mr. Brock, for fifty years. There were Crumply, Thompson, Donahoe and myself for the death penalty. After we had considered the matter, until yesterday morning (Thursday) sometime before noon, we then stood four for the death sentence and eight for the life sentence; the two that were for the death punishment went over to the eight, making ten to two, and we were standing that way until Thursday evening, when I first heard of this former trial. I think it was yesterday (Thursday) evening when I first heard it mentioned. Q. Who did you first hear speak of it, and what was said? A. Mr. Brock said, 'Mr. Rose, you are putting your judgment against twenty-two men.' I think some one else spoke of it after that, but every time it was spoken of some one would speak up and say, 'It has nothing to do with us.' This was all that Mr. Brock said, but I understand he meant that the twelve men who tried defendant before gave him ninety-nine years or life, and ten on this jury were for the same thing, making twenty-two men. The only change that was made after the subject was mentioned was Mr. Pope and I changed from the death penalty to life sentence. I thought Mr. Pope was for the death penalty from the start, but I think he talked on both sides. He (Pope) stated that there was some doubt in his mind as to his guilt, but said that if there was no question about his guilt he deserved the death penalty, and said that a majority of the jury being satisfied of his guilt convinced him that he was guilty, and if so he deserved the death penalty. The mention of the verdict of the other jury was not for the purpose of trying to raise the punishment. It had no effect on me what was said. The subject was never mentioned, but some one suppressed it by saying that we have nothing to do with that."

Mr. Harpole, a witness, testified: "I was a member of the jury that tried Dave Smith, defendant. We rendered a verdict this morning, Friday. When we first retired to consider our verdict, I was for twenty-

five years' sentence. I think Mr. Brock was for fifty years at first. Another juror, Mr. Buffington, was for thirty years. I am not right sure, but think I heard it mentioned in the jury room that the other jury gave him ninety-nine years. I agreed to a life-term sentence Thursday morning. I never heard the mention of the other verdict until Thursday evening, and at that time all had agreed to a life sentence except those who were for the death penalty. It was just mentioned then, and then someone said that it has got nothing to do with us. It was not argued at all; was just mentioned. We went out late Wednesday afternoon, and I agreed to a life term Wednesday night or Thursday morning before I heard anything about another trial."

Mr. Buffington testified: "I was a member of the jury that tried defendant. We went out to consider our verdict Wednesday evening about 9 o'clock. When we first went out I was for thirty years' sentence. I changed next morning, Thursday morning, to a life sentence. We then stood eight for life and four for death penalty. In the afternoon yesterday (Thursday) we stood ten for life and two for death penalty. I think I heard a little something said about another verdict Thursday evening; don't remember that it was mentioned more than once; heard some one say that we have nothing to do with that. There was one juror, Mr. Pope, that I was under the impression was for the death penalty. He said that he believed the man guilty, and if he was he deserved death, but had some little doubt and would agree to life. The way it came up about the other verdict, some one was discussing whether ninety-nine years and life sentence was the same, and I asked Mr. Rose if he ever heard of a man being hanged for a crime like this, and he said no, and finally some one just remarked that our decision was something like the other sentence; another said no, that was for ninety-nine years, and it was asked if that was not the same as life sentence and we then got the charge and read it. At this time all had agreed to life sentence but Mr. Rose and Pope, and they were for death. I think some one said that the evidence showed that he had something to do with the girl more than once, but it was not used as a reason for giving him the larger penalty. This was said in discussing argument of lawyers, one of whom said the circumstances showed it was not the first time."

Mr. Pope testified: "I was a member of the jury that tried defendant. I was for the death penalty until this morning; when it was brought up about other verdict I stood for death at that time, and had been for death penalty all the time. I can say positively that those who were for the death penalty at the time the other verdict was mentioned were for life sentence. My best recollection is, that while we were divided between death and life sentence, and in a discussion of life sentence, some juror said the other jury only gave him ninety-nine years and a man rose up and said that we have nothing to do with that. I was the last man to come over from the death penalty to the life sentence. I remember that someone said that it dropped out in the evi-

dence that he had something to do with his other girl. I think I heard something said in the argument about that."

Mr. Brock testified: "I was a member of the jury that tried defendant. At first I was for life sentence and never changed. I think I mentioned it first about the other jury. All then were for life sentence except two, Mr. Rose and Mr. Pope, they were for death, and I said to Mr. Rose, who was for death penalty, 'You certainly will not hold out against twenty-two men.' This was all I said or heard said. I had referred to the ten men on this jury and the twelve men on the other jury. The only change that was made after this, was a change by those from the death penalty to a life sentence. I sorter think it was mentioned at another time; think it was in the morning, won't be positive, but know I never heard it mentioned until after all had agreed to a life sentence except two, and they were for the death penalty."

John Thompson testified: "Before I went on the jury in the Dave Smith case, I knew what the other jury had done for him at the last term of the court. I knew that they had convicted him and gave him ninety-nine years in the penitentiary. I know Hess Harrold, Oscar Lee and Jim Cook. I might have said in their presence before I was taken on this jury that the other jury gave him ninety-nine years, but I know that I did not say that they should have hanged him so we would not be bothered. I might have said something about ninety-nine years, for I knew it, but I did not say that; nothing was asked me in my examination upon said trial about what I knew about the other jury or whether I had ever expressed an opinion in the case, but I had not; there was something said in the jury room about the other, but it was suppressed. I heard nothing about it until all had agreed on a life term but two, and they were for death. At the time I went into the jury box, I had no opinion as to the defendant's guilt, and made my verdict alone from the evidence in the case."

Article 823, of the Code of Criminal Procedure, is as follows: "The effect of a new trial is to place the cause in the same position in which it was before any trial had taken place. The former conviction shall be regarded as no presumption of guilt, nor shall it be alluded to in the argument." It has been held in this State that this article extends to and includes any argument or discussion of a former conviction by the jury in the jury room. Horn v. State, 50 Texas Crim. Rep., 404; 17 Texas Ct. Rep., 271. But it has also been held that a mere and casual reference or an incidental allusion to the former conviction will not necessarily afford cause for reversal. See Gaines v. State, 8 Texas Ct. Rep., 616. The question has been before this court in many cases and each case seems to have been disposed of somewhat in accordance with the particular facts. We think the true rule is that where, as in this case, the testimony supports the verdict, and the charge of the court properly submits the case to the jury, that a verdict ought not to be set aside for every incidental and casual mention of a former trial or a former conviction, and that in no case should it be set aside in a case

tried according to law where the conviction is supported by the testimony, unless the court may fairly and reasonably see in the light of all the circumstances that such reference and discussion did or might have prejudiced the appellant's case. It is possible that there is some language in some of the decisions not wholly in accord with the views here expressed, but on full consideration this is believed to be the correct rule, and tested by this rule we believe appellant is without just ground of complaint. Here it is manifest, as we believe, that the only effect of the discussion of the former verdict inured to the benefit of appellant. It caused two jurors who were in favor of the death penalty to go over to the ten, and to give appellant a life sentence. Indeed, the only discussion had was addressed by a juror favoring a life sentence to one of the two jurors standing out for a death penalty, and whatever effect it may have had or did have was to mitigate the sentence and inure to the benefit of appellant. Under all the evidence fairly considered, we hold that reference in the jury room to former trial furnishes no ground for reversal.

Finding no error in the record, the judgment of the court below is affirmed.

*Affirmed.*