## Aniseto Reyes v. The State.

### No. 4502.        Decided March 3, 1909.

**1.—Assault to Murder—Verdict by Lot.**

Where upon trial for assault with intent to murder it was contended in defendant's motion for new trial that the verdict was by lot, and the testimony taken thereon showed that there was no agreement in advance of the balloting that the jury should abide by a verdict obtained by lot, and that the sole purpose was simply to get an expression of the jurors as to the degree of punishment, there was no error. Following Fox v. State, 53 Texas Crim. Rep., 150.

**2.—Same—Argument of Counsel—Allusion to Defendant's Failure to Testify— Bill of Exceptions.**

Where upon motion for new trial defendant complained of State's counsel's argument as referring to defendant's failure to testify, but the bill of exceptions on appeal did not bear out defendant's position, and there was no bill of exceptions by bystanders, the court did not err in refusing to hear testimony to show that State's counsel did use such argument; and the appellate court must be guided by the bill of exceptions as presented.

**3.—Same—Evidence—Motive.**

Upon trial for assault to murder where the evidence showed that defendant had made threats against the injured party in reference to a certain girl, there was no error to admit testimony that defendant had been waiting on this girl for two or three years.

**4.—Same—Newly Discovered Evidence.**

Upon motion for new trial where the alleged newly discovered evidence could have easily been discovered by the defendant before trial, and was of such a character as not to be material in any event, there was no error in overruling the motion.

**5.—Same—Misconduct of**

Where upon trial for assault with intent to murder it was shown on motion for new trial that the jurors in their retirement in considering the verdict had alluded to and discussed defendant's failure to testify, and also the fact of his former conviction, and this must have operated to the prejudice of the defendant, there was reversible error.

Appeal from the District Court of Tom Green. Tried below before the Hon. J. W. Timmins.

Appeal from a conviction of assault with intent to murder; penalty, eight years imprisonment in the penitentiary.

The opinion states the case,

*L. L. Montgomery* and *Taylor & Frink,* for appellant.—On question of verdict by lot: Brookman v. State, 50 Texas Crim. Rep., 277, 96 S. W. Rep., 928; Sanders v. State, 45 Texas Crim. Rep., 518, 78 S. W. Rep., 518; Driver v. State, 37 Texas Crim. Rep., 160, 38 S. W. Rep., 1020. On question of defendant's failure to testify: Tate v. State, 38 Texas Crim. Rep., 261; Thorpe v. State, 40 Texas Crim. Rep., 346, 50 S. W. Rep., 383; Woolley v. State, 96 S. W. Rep., 27; Buessing v. State, 43 Texas Crim. Rep., 85, 63 S. W. Rep., 318; Adams v. State, 64 S. W. Rep., 1055; Beard v. State, 65 S. W. Rep., 905. On question of argument of counsel: Hunt v. State, 28 Texas Crim. App., 149; Reed v. State, 29 Texas Crim. App., 449; Quintana v. State, 29 Texas Crim. App., 401; Jordan v. State, 29 Texas Crim. Rep., 595; Wilkins v. State, 33 Texas Crim. Rep., 320. On newly discovered evidence: Butts v. State, 35 Texas Crim. Rep., 364; Price v. State, 36 Texas Crim. Rep., 403.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—Appellant was indicted in the District Court of Tom Green County on a charge of assault with intent to murder one Jesus Munoz. On June 5, 1908, thereafter he was on trial before the court and jury, found guilty as charged, and his punishment assessed at confinement in the penitentiary for eight years.

The evidence shows that both parties were Mexicans and both resided in or near San Angelo. On the morning of the 27th day of April, 1908, Jesus Munoz was found on the streets of San Angelo in a horrible condition, a gunshot wound in his head and his face beaten almost beyond recognition. He was removed to the home of his father and his wounds treated, and he remained practically unconscious for many days. On the night before he was found, there had been a dance given in San Angelo, which was attended by both appellant and the assaulted party. It seems from the evidence that for quite awhile appellant had been waiting on one Juanita Subia, and that at the dance she had danced three sets with appellant and three with Munoz. It is shown by the testimony of Adolph Flores that on the night in question, appellant called him aside and asked him if he was going with this girl and that Flores told him to ask her, to which he replied that he did not believe what she said, and appellant then asked him if Jesus Munoz was going with her, to which he replied that he did not know; that he asked witness if Jesus was his friend and he told him yes, that he thought he was, he pretended to be his, witness', friend, and "he said he thought Jesus wasn't nobody's friend." It was also shown by the testimony of the girl that something like a month before the shooting, appellant had asked her if she had anything to do with either Jesus Munoz or Adolph Flores. This

testimony was introduced and other testimony of similar character, to show that appellant's jealousy of Jesus Munoz was the motive for the crime and was admissible for this purpose. Jesus Munoz testified that he was walking along the street, about 12 o'clock, with appellant, and that he had done nothing to him, and that appellant was near him and on the left side of him, and that nobody else was near him, and that he was shot and did not know who shot him. The evidence further showed that the flesh on the left side of his face was powder-burned.

Dr. Smith, the physician who attended Munoz, testified that the wound entered on the left side of his eye, and he probed the pistol shot wound to nearly the depth of his finger; that the bullet passed under the eye, and that afterwards, perhaps two days, he blew his nose and blew out a little brain on his handkerchief; that at the time he was conscious but hardly at himself; that he thought he was that way yet, and that it looked to him like his mind might be affected and that he did not believe that his mind was entirely clear. We think, from the evidence which we have carefully read and carefully analyzed, that the conclusion is inevitable that the assaulted party was shot by appellant.

1. There are a number of grounds urged by appellant in his motion for a new trial why the conviction should be set aside.

First, it is averred that the cause was decided by lot, in that while the jury were in consultation and during their deliberation they agreed upon the following plan: That each juror should write his verdict and the number of years of confinement which he proposed for defendant and that the total number of years so written down should be divided by twelve, the number of jurors, thereby obtaining the average length of years of confinement, and agreed that they should thus arrive at their verdict in said cause. This matter was fully investigated by the court, and among others, the following jurors were sworn and testified in the presence and hearing of the court.

D. B. Adams testified that soon after the jury went out there was an agreement reached that appellant was guilty and that someone (Mr. Carpenter, as he remembered), suggested that they take a ballot; that the jury wanted all to agree to take a ballot and write it down on a piece of paper, and drop it into a hat, and then count it out and divide by twelve, the number of jurors; that he replied that he would not do that; that it was not the proper way to get at the thing; but that after this they did each set down the number of years for which they thought appellant ought to be punished and made the division by twelve. On cross-examination, this juror testified as follows: "Q. Were you all adding up these votes totalling up the votes of each one for the purpose of arriving at a verdict or seeing how much it would average?" To which he answered: "I don't know. You could consider it both ways pos-

sibly. I said I wouldn't agree before we made a ballot. I said I wouldn't agree to stand by that kind of a verdict because I don't think it is right, but Mr. Carpenter said let us take it anyway and see how we stand. I said all right, and that was about the extent of the agreement beforehand. I didn't bind myself to abide by it, but most of the jury wanted to stand by it."

D. C. Chamberlain, another juror, testified that they first took a ballot as to the guilt of the defendant and after arriving at a unanimous conclusion that he was guilty, there was then some balloting done on the punishment to be assessed, but in respect to the matter of agreement to abide the result thereof, he says: "I didn't understand that in balloting there that they were to divide by twelve and abide by it. We just did it to see that each one was to know the length of time in our judgment the punishment should be."

Rube Bates, another juror, testified to the balloting and probably makes the strongest showing of either of the jurors sworn in respect to this matter and this statement appears in his cross-examination, in which the following questions were asked and answers made: "Q. Did you make any agreement that each man would write down the numbers of years he thought the defendant ought to receive, and that they add that up and divide by twelve, and that that should be the verdict? A. I did not make any agreement to be bound by a verdict of that kind. It was not the agreement of the jury to be bound or reach a verdict in that way. It seems to me that that verdict that was added up and divided by twelve came to nine years and a fraction. Q. There was no ballot taken there that divided to amount up to eight years? A. No, sir, the balloting was all done and we arrived at the verdict."

Matters of practice and evidence occurring during the trial are largely to be determined by the trial court, and ordinarily his conclusions in respect thereto are binding upon this tribunal. It will be noted that only three of the jurors were sworn, and a fair analysis of the testimony would seem to leave no doubt that there was no agreement in advance of the balloting that the jury, as claimed, should abide thereby and that the number of years so ascertained should be the verdict of the jury. On the contrary this course seems to have been taken as a means of securing an expression from them as to their views in respect to the punishment; and the jurors, in substance, seemed to agree on the proposition that this was the sole purpose of taking the ballots. Leo Fox v. State, 53 Texas Crim. Rep., 150.

2. Again, appellant in his motion for new trial complains that the court erred in permitting counsel for the State, in his closing argument to refer to the failure of appellant to testify in his own behalf. A bill evidencing this fact and that such comment was made was tendered by counsel for appellant to the court but was not

approved in the form tendered. The court did, however, endorse on such a bill, a statement to the effect, in substance, that he was at the time paying no attention to the argument of counsel for the State and did not know what he said. The bill with this qualification was accepted by counsel for appellant. There was no effort made to prove up a bill by bystanders, and the matter rested in this condition until the motion for new trial came on to be heard when counsel in question, Mr. W. A. Anderson, was placed on the witness stand and counsel for appellant offered and undertook to prove by him that as a matter of fact he did in substance use the language set out in appellant's bill of exceptions tendered to the court and had in general referred to appellant's failure to testify. This evidence was objected to by counsel for the State on the ground that it was a matter that should have been evidenced and perpetuated by bill of exceptions, and we think this objection was good. If it was allowed in every case where an issue of fact had been made and proof introduced as to what transpired on the hearing so as to supply a bill of exceptions, which the court declined to approve, it would also follow that they should be permitted to introduce proof, qualify; overrule, modify or change the record as made by the court in bills of exceptions allowed by him. This practice would lead to endless confusion, and is one that ought not to be and can not be tolerated. The office of district judge is a great position; it is a great tribunal; and unless we may and can give credence and have respect for the proceedings of the court below, as authenticated and evidenced by the approval of our district judges, there could be no certitude or integrity in the records which reach us.

3. Again, complaint is made that the court erred in permitting the witness Juanita Subia to testify, in substance, that appellant had been going with her or waiting on her for two or three years. This testimony was objected to on the ground that it was incompetent, immaterial, irrelevant and calculated to prejudice the jury against this defendant, and that there was no evidence that appellant was in love with said girl, or she with him, or that they were betrothed or had ever intended to marry. The evidence does show, while showing no betrothal or engagement between the parties, that appellant had been going with or waiting on the girl for two or three years, which, taken in connection with the other evidence, including a threat, made by appellant to Munoz in reference to the girl in question, renders this testimony admissible as showing such relationship as would furnish a basis for the motive for the assault. With its weight, of course, we have nothing to do. Its admissibility seems to us to be clear.

4. Again, the motion for new trial was urged on the ground of newly discovered testimony. The sister of appellant testified that the officers in searching the house where appellant stayed and

where he slept on the night of said assault, and where he frequently slept, found a pistol; that it could have been shown by the witness Merchant that this pistol was in a worthless condition and could not possibly have been used in inflicting the wound upon Munoz; and it was claimed that this testimony could not have been discovered by counsel for appellant by the exercise of any reasonable diligence. We confess that we do not see how there could be any difficulty about discovering the condition of the pistol. If it had been there for any considerable length of time, the appellant must have known its condition, his sister probably knew it and certainly his brother-in-law, who owned the house, could have known and would have known it. Nor do we believe that the testimony was particularly valuable in any event. That the injured party was shot, admits of no doubt. The mere fact that a pistol was found in the house where he stayed, which was useless, would not have been important on any issuable fact in the case.

5. There is no complaint of the charge of the court in the motion for new trial, nor indeed is same subject to any serious objection.

6. Again, it is urged that a reversal should be had because of the fact that the failure of the appellant to testify in his own behalf was discussed by the jury. As stated above, only three of the jurors testified, or were produced on the hearing of this matter. The juror, D. B. Adams, testified as follows: "I think there was something said about the defendant not testifying in his own behalf. I think it was Mr. Brown, was the first man that suggested the idea. He said, did you notice that the defendant did not testify in his own behalf, and if he was not guilty why shouldn't he have been put on the stand? He spoke and was talking to me and I told him, that's nothing; a man don't have to take the stand in any kind of matter for himself, and it was brought up just in these words, and that was used two or three more times. I don't know who made about the same remark. I didn't consider it as much myself. I didn't consider that a man had to testify. There were four that I recollect that spoke of the defendant not taking the stand and testifying in his own behalf. Mr. Brown, if I remember right, brought up the subject and said the defendant didn't take the stand in his own behalf, and it looked like he was guilty by that. That statement never had a bit of effect in the world on me." Another of the three jurors who were sworn testified as follows: "I didn't hear that mentioned about the defendant not going on the stand and testifying in the case; I don't think I heard that mentioned."

Another of the jurors, Rube Bates, testified: "As well as I recollect, some one asked, why they didn't put the Mexican on the stand, and if there was any reply made to it, I didn't hear it. I recollect hearing the question asked. I don't remember whether

the question was asked by one Mr. Brown, who lived down about Mereta. I didn't hear any answer. I don't know whether any other juror heard it or not. I suppose they did, but I don't know." Again, on cross-examination, he says: "The fact that the defendant didn't go on the stand and testify was not discussed by the jury. It was not considered in evidence by any of the jury so far as I know."

In addition to the testimony taken before the court, appended to appellant's motion for a new trial, was an affidavit of J. J. Brown, one of the jury trying him, filed on June 6, 1908, in which he stated that "There was quite a little discussion of the fact that the said defendant Aniseto Reyes was not put on the witness stand in said trial; that this discussion created a stronger feeling against defendant than would otherwise have existed."

The motion of appellant containing this affidavit remained on file until June 26, 1908, when it was acted on. It will be noticed from the above statement that if the affidavit of Brown is to be believed that not only was the failure of the defendant to testify discussed, but that this discussion created a stronger feeling against him than would otherwise have existed. It appears from the testimony of the witness Adams that this matter was not only mentioned but discussed, and that Brown said, "Did you notice the defendant did not testify in his own behalf, and if he was not guilty why shouldn't he have been put on the stand?" And that the witness replied to him: "That is nothing; a man don't have to take the stand in any kind of a matter for himself." It will also be observed by the testimony of Adams that this matter was brought up in these words, and that this language was used two or three or more times. It is stated by Adams, in his testimony, that he did not consider it himself; that he did not consider that a man had to testify. This, of course, was a correct statement of the law, and seems to have been in line with his argument. But it is equally clear that, if we are to have regard to the terms of the discussion, Brown, and probably other jurors, did pay some attention to it, and were not improbably influenced by it.

Article 823 [Evidently art. 770, Code Crim. Proc., was intended.— Reporter.] of the Code of Criminal Procedure is as follows: "The effect of a new trial is to place the cause in the same position in which it was before any trial had taken place. The former conviction shall be regarded as no presumption of guilt, nor shall it be alluded to in the argument." In the case of Horn v. State, 50 Texas Crim. Rep., 404, it was held that this article was broad enough to include and did include any argument or discussion of a former conviction by the jury in the jury room. We have heretofore held, however, and correctly, that it is not every mere and casual reference or incidental allusion to the former conviction that will necessarily afford cause for reversal. Gaines v. State, 77 S. W. Rep., 10, 8 Texas Ct. Rep., 616. In the case of Smith v.

State, 52 Texas Crim. Rep., 344, 106 S. W. Rep., 1161, on a full review of all the authorities, we held that a conviction would not be set aside, unless the court may fairly and reasonably see and determine, in the light of all the circumstances, that such reference and discussion did or might probably have prejudiced the appellant's case. We have no doubt that this is the correct doctrine, and that its proper application to the facts here must and should work a reversal of the conviction. The matter here was more than a mere casual or incidental reference. It was an argument by the juror Brown that the appellant was guilty, and if he was not guilty the pertinent inquiry was urged why he should not have been put on the stand. Nor does the matter rest here, as Adams says: "It was brought up just in these words, and that was used two or three more times." In a matter of this kind, necessarily the decision in every case, must to some extent rest upon its peculiar facts. In view of the evidence in the record, and in view of the state of the record in respect to the comment of counsel on appellant's failure to testify, having regard to the affidavit of the juror Brown that remained twenty days on file, with the direct statement and charge of the discussion in the jury room of the former conviction, and that it operated to the prejudice of appellant, aided by the testimony of the juror Adams, who confirms the charge contained in Brown's affidavit, and which includes not only an allusion but an argument, and a forceful argument of appellant's guilt and silence, we think it would be unfair to appellant and violative of the statute to affirm his case. For this error, and this error alone, the judgment of conviction is set aside and the cause remanded.

*Reversed and remanded.*