**Paul ROUGEAU, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68868.**

**Court of Criminal Appeals of Texas, En Banc.**

**Dec. 22, 1982.**

Rique D. Bobbitt, Bob C. Hunt, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Alvin M. Titus and Ned Morris, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

OPINION

CLINTON, Judge.

Appellant was charged with and was convicted of capital murder of a police officer, alleged to have been committed during a robbery at the Stock Exchange Club in Houston. The death penalty was assessed. Sufficiency of evidence is not challenged.

Appellant contends that certain jurors were improperly excused for cause, in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The United States Constitution does not permit the exclusion of jurors from a capital case merely because they have conscientious scruples against the death penalty, *Witherspoon,* supra, nor does the Constitution permit their exclusion

> "if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond a reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt."

*Adams v. Texas,* 448 U.S. 38, 50, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581 (1980). In the present case Mrs. Leonard K. Buller, venirewoman number forty-seven, was just such a person, a classic "*Adams* juror," but she was excused for cause. Defense counsel objected, based on *Witherspoon,* and on the court's failure to allow him adequately to examine her.

The trial court began the voir dire of Buller. She initially indicated she had reservations about the death penalty and did not think she "could make the decision that someone else had to die." The judge asked if she would automatically vote "no" to the penalty questions[1] regardless of what the evidence showed. She responded, "I can't really say that. I am sorry I don't think I could really say that either. I have never been in this situation." She continued, "I understand. I always try to be fair, and yes, I would try to judge things the way that I see the evidence presented, you know."

1. Throughout voir dire the court kept the penalty questions on display on a bulletin board in the courtroom for the benefit of the prospective jurors. The questions were taken from the following portion of Article 37.071(b)(1) and (2), V.A.C.C.P.:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

The court continued the questioning. The record reads as follows:

"Q: You understand that you do not assess the death penalty?

A: Yes, I understand.

Q: I assess the death penalty. You are the one who finds the facts on which I base it. *If you believe the answer to question one should be 'yes' based on the evidence and the facts, would you answer it 'yes?'*[2]

A: *Yes.*

Q: *And if you believe that the answer to question two should be 'yes,' based on the facts, could you answer it 'yes?'*

A: *Yes.*

Q: And you understand when you are on the jury you will swear to a true verdict render [sic] according to the law and the evidence submitted to you so help you God. If you do take that oath you would follow it?

A: Yes.

Q: So *you would answer those questions 'yes' if it was proved to you beyond a reasonable doubt that the answer should be 'yes?'*

A: *I would have to.*

THE COURT: I will turn the questioning over to the State's attorney."

By this point Buller had shown herself clearly to be acceptable under *Witherspoon,* so the avenue of inquiry by the court and State shifted to V.T.C.A. Penal Code, § 12.31(b).

We observe that when Buller and other jurors similarly situated were "excused for cause" a legal ground for doing so was rarely explicated. Attention is called to the following statement by the Supreme Court

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; . . . ."

2. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated, as well as quotation marks around words "yes" and "no."

in *Adams,* supra, 448 U.S. at 47–48, 100 S.Ct. at 2527–2528:

"As an initial matter it is clear beyond peradventure that *Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude: if prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out. [Citation omitted] While this point may seem too obvious to bear repetition, it is apparent from their frequent references to *Witherspoon* as a ground for 'disqualifying' prospective jurors [footnote omitted] that the State, and the Texas Court of Criminal Appeals, might have fallen into the error of assuming that *Witherspoon* and § 12.31(b) are both grounds for exclusion, so that there is no conflict if § 12.31(b) excludes prospective jurors that *Witherspoon* does not."

■ The prosecutor began to question Buller but fell to wrangling with defense counsel over the difference between *Witherspoon* and V.T.C.A. Penal Code, § 12.-31(b). The judge interrupted as follows:

"THE COURT: Let me ask these questions.

It would be your duty not to let the mandatory penalty for death or life imprisonment *affect your deliberations* on any issue of fact. Can you and will you perform this duty if you are selected as a juror?

MRS. BULLER: I would certainly try to put it out of my mind.

THE COURT: With regard to those special issues you will be asked that make a difference whether the defendant receives life or death, would that prevent you from basing your findings solely on the evidence presented to you?

MRS. BULLER: No, *I can do that.*"

Buller's answers to subsequent questions posed by the prosecutor showed she believed her deliberations might *be affected* by the mandatory penalty scheme. However, since *Adams* this is no longer enough to disqualify her. *Evans v. State,* 614 S.W.2d 414 (Tex.Cr.App.1981).

Throughout voir dire Buller maintained that she would answer the penalty questions in the affirmative if the evidence warranted. She denied that she would automatically vote "no" to avoid the death penalty regardless of the evidence. After the following the State asked the court to "excuse for cause:"

"Q [State]: ... Now, I take it from the statement that you just made that you were telling me you feel like your deliberations on these questions would be affected by the mandatory punishments that might attach depending upon your answers?

A: Yes.

Q: And let's take it one step further after that. Are you saying that if you felt like from the evidence beyond a reasonable doubt that your answers should be 'yes,' *you would be inclined to favor a 'no' answer or would in fact even return a 'no' answer,* even though you felt the answer should be 'yes' based on the evidence so that the punishment of death would not be imposed. Is that a correct statement?

A: Yes."

■ The court granted defense counsel's request that he be allowed to question her. However, the court promptly cut him off and excused Buller before defense counsel even could finish introducing himself and his line of questioning. The court fell into reversible error in violation of *Witherspoon* by excusing Buller for cause over defense counsel's objection merely upon a showing that the prospect of the death penalty might affect her decision and despite her statements that she could answer the penalty questions in the affirmative in a proper case. *Adams v. Texas,* supra; *Lackey v. State,* 638 S.W.2d 439 (Tex.Cr.App.1982) (Opinion on Appellant's Motion for Rehearing). Furthermore, the court's refusal to allow counsel to examine Buller further in order to rehabilitate her when she had not clearly excluded herself was reversible error. Compare *White v. State,* 629 S.W.2d 701, 706 (Tex.Cr.App.1981).

As the court reasoned in *Burns v. Estelle,* 626 F.2d 396, 398 (CA5 1980):

"Further questioning, which was denied, might well have either revealed that she could lay her personal views aside, follow the court's instructions, and do her duty as a citizen or made unmistakably clear that she could not or would not do so. What her answers might have been will never be known. She was therefore prematurely excused, with the showing required by *Witherspoon* for her dismissal incomplete. Since she was, [her] death sentence cannot be carried out."

The ultimate dismissal of Buller and the denial of appellant's right to have counsel examine her was by no means an isolated instance, but was part of a ritualism practiced by the trial court early in voir dire and repeated throughout when veniremen indicated reservations about the death penalty. The record of that examination presents a ritualistic litany with which prospective jurors were "disqualified" after expressing those reservations. The next part of the procedure was to limit opportunity of defense counsel to examine the venireperson more closely as ability to follow the law or abide by one's oath.

For example, after Victor Reddick, venireman number five, indicated he had reservations about the death penalty the court asked him the following leading questions:

"Q: Would your reservations about capital punishment prevent you from making an impartial decision as to the defendant's guilt?

A: Yes sir.

Q: Would you automatically vote against the imposition of the death penalty no matter what the trial might reveal?

A: I would.

Q: Regardless of the facts and the evidence, you could never assess death as punishment for crime in a proper case?

A: No."

Defense counsel was only permitted to ask how long Reddick had opposed the death penalty. Reddick said he had never believed in it. The court interrupted counsel's next question and stated to Reddick, "You said you don't believe in the death penalty. You will be excused." Counsel was not permitted to ask Reddick whether or not, despite his beliefs, he could answer the penalty questions affirmatively if the evidence so warranted. Reddick was prematurely excused. See *White v. State,* supra.

Similarly, when W.O. Langenegger, venireman number fourteen, in reply to defense counsel's question said he could not imagine any case where the proper punishment would be death, the court excused Langenegger for cause over defense counsel's objection that he was not being allowed to examine him sufficiently. At that point the following exchange occurred:

"THE COURT: I let you ask him if he believed in the death penalty and he said he didn't. If someone tells me something I have to believe—

MR. HUNT [Defense Counsel]: This denies Mr. Paul Rougeau his rights under the Fourteenth Amendment and due process of law.

THE COURT: Bring in Mrs. Powell.

MR. BOBBITT [Defense Counsel]: For the record, the issue is not whether he believed in the death penalty but whether he could answer the questions and he didn't have time to read the questions.

THE COURT: That's another facet.

MR. BOBBIT: We weren't allowed—

THE COURT: If he disqualifies on probable cause, you don't have to ask him about those questions.

MR. BOBBIT: For the record, we want it known for the record that he didn't have the chance to read the two questions he has to answer and decide whether or not his conscientious scruples interfere with his ability to answer the questions, not whether he has conscientious scruples against the death penalty."

As was the case with venireman Reddick, defense counsel was not allowed to direct Langenegger's attention to the penalty questions during voir dire. Langenegger was excused prematurely.

The voir dire of John Nunez, venireman number forty one, showed how misleading the initial litany of questions and answers could be. Nunez replied that he didn't believe the death penalty would be proper in any case and that he would *automatically* vote against it. However, when the court directed his attention to the penalty questions Nunez did *not* say he would automatically vote "no" to avoid the death penalty. The record reads as follows:

"Q: (By the Court) Would you automatically vote 'no' if the evidence showed it should be 'yes' or would you vote 'yes?'

A: If I knew by automatically voting 'yes' it would result in a death penalty, I think I would have *reservations* about voting 'yes.'

Q: Could you vote 'yes' if you thought all of the evidence pointed to number one should be answered 'yes,' could you answer that question 'yes?'

A: *If there was sufficient evidence I could answer that question 'yes.'*

Q: Look at question two. If there is sufficient evidence to that question, could you answer that question 'yes?'

A: I would have some *reservations* with that question.

Q: I understand. You could answer it 'yes' if the evidence was presented, even though it would be difficult for you to do so?

A: Well, I'm really *not sure* right now.

MR. MORRIS [State]: We again move this juror be excused for cause under Witherspoon because the questions have nothing to do with the Witherspoon [sic] as to whether he has conscientious—

THE COURT: *I am not sure whether he believes in the death penalty or not.* He has never told the Court one way or another. He always says with reservations. I don't know what reservations are. That's what I am trying to find out.

Q: (By the Court) I am trying to interpret what you mean. You have to tell me.

A: As far as question two, whether there is a probability the defendant will commit—I am *not sure,* you know, whether anyone would know whether there is a probability or not whether anybody will commit a crime in the future."

The court then abandoned the voir dire about the penalty questions and, over defense counsel's objection, excused Nunez for cause after the following:

"Q: (The Court) If the facts were bad enough, *could you impose a death penalty?*

A: I don't believe in imposing the death penalty in any kind of case."

The court refused to permit defense counsel to ask Nunez a single question.

Nunez had said if the evidence was sufficient he could answer one penalty question with a "yes," and, concerning the other question, he was merely *unsure* how the State could prove a defendant's future dangerousness. He did *not* say he would vote "no" if the State proved to him beyond a reasonable doubt that the answer should be "yes." Defense counsel objected that Nunez had only been asked if *he* could impose the death penalty and not whether he could answer the penalty questions affirmatively. Counsel requested and was refused permission to pose hypothetical situations to determine whether or not Nunez could answer the penalty questions in the affirmative in a proper case.

As was the case with venireman Buller, Nunez had not clearly excluded himself. His responses only had been equivocal regarding his ability to answer "yes" to the second penalty question. Further questioning by defense counsel might have shown he could put his personal views aside, follow the court's instructions, and answer the second question in the affirmative. He was prematurely excused with the showing then required by *Witherspoon* and now reaffirmed by *Adams* incomplete.

To venireman number forty eight, Robert Barker, the court asked the same series of questions it initially had asked Nunez and

Reddick. The State moved for his exclusion for cause. However, the judge declined to exclude, and said that he would ask one additional question:

"Q: ... knowing that your answers to these questions would dictate whether the defendant gets life or death, would you automatically vote 'no' to those questions regardless of what the evidence was concerning them?

A: *I don't believe I would vote automatically 'no' to either one or both of them.*"

Thereupon, the judge rephrased the question in an extended fashion, received the opposite answer that Barker could not vote "yes," and immediately excused him for cause over defense counsel's objection without allowing counsel to ask a single question. Barker had not unequivocally expressed an inability to answer "yes" to the penalty questions. Further questioning was in order for rehabilitation, and his exclusion was reversible error under *Adams* and *Witherspoon*.

Curtis Smith, venireman number fifty three, told the court that he had *no* conscientious scruples against the death penalty, that he would *not* let the mandatory life or death penalty affect his deliberations, and that he would base his findings solely on the evidence. After extensive questioning by the State, Smith expressed doubts about the second penalty question. He said it involved two questions—(1) whether the defendant would commit future acts of violence, and (2) whether such acts would constitute a continuing threat to society. In an effort to explain the question the State and the court went to considerable lengths, concluding as follows:

"[THE COURT]: ... you would have to find he would commit criminal acts of violence or a probability he would, but that those acts would be a threat to society and unless you believe both of those things, you have to answer the question 'no.' But if you believe beyond a reasonable doubt that he would do both of those things, then you would have to answer 'yes.'

A: No, I don't believe he would do that.

Q: [State] In other words, you don't believe that the law [sic] you would be able to answer this question as to what he is going to do in the future? You see, *he might go out and kill somebody every day for the rest of his life, but you are saying no that he wouldn't do that.* You are saying there would be no way to prove it?

A: That's not what I am saying. Like you take the top from the bottom, if you go out and do that the second time, *I don't think you would do it the second time.*

Q: *You don't think that a man that would commit a capital murder would do this again?*

A: *No, I don't think so.*

Q: I see. Under any circumstances you are saying just in order to clarify it, *you were saying there is no way the State could prove it to you that this defendant would commit criminal acts of violence in the future?*

A: *No.*

Q: Under any circumstances?

A: Under any circumstances.

Q: Believe me, that's what we are here to find out is your beliefs. So, you just can't answer question number two regardless of what the evidence was?

A: No."

At that point the court excluded Smith for cause over defense counsel's objection without allowing counsel to ask any questions. The court explained that according to "a new case just out if jurors don't qualify it is not necessary to let the other side rejuvenate [sic] them." However, Smith had not clearly disbarred himself. He was not at all opposed to the death penalty. He never said that he would automatically answer the second penalty question "no" to avoid the death penalty even if the State had proved to him beyond a reasonable doubt that the defendant would probably commit future criminal acts of violence constituting a continuing threat to society. He was asked whether he thought a man *would commit* capital murder again

or whether the State *could prove a man would commit* criminal acts of violence in the future. He was not asked what his answer would be to the second penalty question if the State *did prove* to him beyond a reasonable doubt that a defendant would be dangerous in the future. Further questioning might have shown him to be capable under *Adams* and *Witherspoon.* Dismissal of Smith was without adequate reason.

■ Prematurely excusing a single juror for reasons insufficient under *Witherspoon* must result in our setting aside the death penalty. *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). Accordingly, the judgment must be reversed and the cause remanded. *Grajalva v. State,* 614 S.W.2d 424, 425 (Tex.Cr.App.1980–1981).

The judgment of conviction is reversed and the cause remanded.

TOM G. DAVIS, DALLY and W.C. DAVIS, JJ., dissent.