Paul ROUGEAU, Appellant,

v.

The STATE of Texas, Appellee.

No. 69233.

Court of Criminal Appeals of Texas, En Banc.

Sept. 23, 1987.

Rique D. Bobbitt, Bob C. Hunt, William W. Burge, Kristine C. Woldy, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Roe Morris, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TEAGUE, Judge.

Paul Rougeau, hereinafter appellant, was convicted of the murder of A.C. Wilkins, while in the course of committing or attempting to commit the offense of aggravated robbery, which caused the offense of murder to become capital murder, see V.T. C.A., Penal Code, § 19.03(a)(2), and, after the jury answered in the affirmative the special issues that the trial judge submitted to it, see Art. 37.071, V.A.C.C.P., the trial judge assessed his punishment at death.[1] We affirm.

Appellant, through court appointed counsel, presents twenty points of error, see *Texas Rules of Appellate Procedure*, Rules 210 (b) and 74 (d). None of his points of error challenge the sufficiency of the evidence either as to guilt or punishment. Therefore, only when necessary, we will not elongate this opinion by setting out the facts that pertain either to guilt or punishment.

Appellant's points of error are as follows: (1) "The trial court erred in overruling Appellant's motion for mistrial when witness Robinson referred to the prior trial of this case before the jury"; (2) "The trial court erred in denying Appellant's request that the state be restricted from using data processing equipment to investigate the criminal background of defense witnesses"; (3) "The trial court erred in permitting the prosecutor to identify himself before members of the jury panel as representing the family of the victim"; (4) "The trial court erred in permitting the prosecutor to represent to the members of the jury panel that when the punishment question talks about

---

1. This is the second time that appellant has been tried, convicted, and assessed the death penalty for this offense. Previously, in *Rougeau v. State,* 651 S.W.2d 739 (Tex.Cr.App.1982), this Court reversed appellant's conviction and sentence of death after finding that the trial judge erred in excusing a prospective juror merely on the showing that the prospective death penalty might affect the juror's decision despite her statements that she could answer the special issues, see Art. 37.071, supra, in the affirmative in a proper case. After the cause was returned to the trial court, the State agreed to recommend a life sentence if appellant would plead guilty. Appellant refused the offer.

society, it includes prison society"; (5) "The trial court erred in denying Appellant's challenge for cause to venire [person] Margaret Route, who was later excused by the defense"; (6) "The trial court erred by excusing venireman James Smith on his own motion"; (7) "The trial court erred in permitting the testimony of Officer D.W. Howell over objection by defense counsel"; (8) "The prosecutor committed error by calling Appellant's common law wife to the stand before the jury"; (9) "The trial court erred in admitting the blood sample test results because the witness could not testify from whence they came"; (10) "The trial court erred in permitting witness Freedman to testify that Appellant refused permission to remove the bullet lodged in his body"; (11) "The trial court erred in permitting the prosecutor to state during final argument that Appellant had refused permission to remove the bullet lodged in his body"; (12) "The trial court erred in permitting witness Wesley Warner to testify on punishment because his mere appearance demonstrated that Appellant had been in custody"; (13) "The trial court erred in permitting Wesley Warner to testify because his testimony demonstrated that Appellant had been previously convicted in another trial of this cause"; (14) "The trial court erred in overruling Appellant's pro se motion to dismiss for denial of a speedy trial"; (15) "The trial court erred in denying Appellant's motion for mistrial when the prosecutor argued the defendant's failure to testify on punishment"; (16) "The trial court erred in overruling Appellant's amended motion for new trial based on newly discovered evidence known to the prosecutor at the time of trial and not conveyed to the defense, despite its exculpatory nature"; (17) "The trial court erred in refusing to quash the indictment"; (18) "The trial court erred in overruling Appellant's motion to suppress evidence because the warrant date is one year prior to the date of the offense"; (19) "The trial court erred in denying Appellant's motion to suppress evidence, based on evidentiary hearings at the first and second trials"; and (20) "The trial court erred in permitting Earl Campa to testify regarding the facts of the arrest of Appellant because the warrant was defective".

We will not address appellant's points of error in the above order, but will address them in the chronological trial order when the complaints arose.

Appellant asserts in his seventeenth point of error that "The trial court erred in refusing to quash the indictment." We agree with appellant that the trial judge erred, but because we find that the error did not amount to reversible error we will overrule his contention.

The State elected to prosecute appellant pursuant to "Count Two" of the indictment which alleges in pertinent part that appellant, "heretofore on or about January 6, 1978, did then and there unlawfully while in the course of committing and attempting to commit Aggravated Robbery, intentionally cause the death of A.C. Wilkins, hereafter [sic] called the Complainant, by shooting the Complainant with a gun".

The record reflects that one of the two experienced trial attorneys appointed to represent appellant also represented appellant in appellant's former trial. See footnote 1, ante. We cannot find anywhere in this record where it could be argued that appellant's trial attorneys were either surprised or ambushed during this trial. The record also reflects or indicates that trial counsel had a transcript of the prior trial testimony of the witnesses who had testified at appellant's former trial and again testified at this trial.

Appellant, nevertheless, argues under his point of error that he was not given sufficient notice through the indictment to prepare for trial. The State does not directly respond to appellant's contention.

■ By the terms of Count 2 of the indictment, see *ante*, appellant was put on notice that the State intended to prove that while in the course of committing or attempting to commit the offense of aggravated robbery he intentionally caused the death of A.C. Wilkins.

Although the indictment alleges that Wilkins' death occurred while in the course of committing or attempting to commit the

offense of aggravated robbery, the indictment does not state that Wilkins was the victim of the alleged aggravated robbery, and, from the evidence presented at the former trial as well as this trial, a person or persons other than Wilkins could have been the victim of the aggravated robbery.

In *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980), and *King v. State*, 594 S.W.2d 425 (Tex.Cr.App.1980), this court held that when criminal conduct constituting an aggravating feature of an offense may be directed at a person other than the murder victim, the specification of that person is a fact to which the accused is entitled should he request it by timely filed written motion to quash. Also see *Woolls v. State*, 665 S.W.2d 455 (Tex.Cr.App.1983); *Pinkerton v. State*, 660 S.W.2d 58 (Tex.Cr.App.1983); *Silguero v. State*, 608 S.W.2d 619 (Tex.Cr.App.1980); and *Evans v. State*, 601 S.W.2d 943 (Tex.Cr.App.1980). In this instance, the intended victim of the aggravated robbery could have been someone other than Wilkins. Thus, under the above decisions of this Court, the trial judge clearly erred in overruling appellant's motion to quash and such would have formerly constituted reversible error. See, for example, *King v. State*, supra.

■ However, in *Adams v. State*, 707 S.W.2d 900 (Tex.Cr.App.1986), also see *Opdahl v. State*, 705 S.W.2d 697 (Tex.Cr.App. 1986), a majority of this Court formulated a new test regarding whether an improper denial of a motion to quash an indictment for lack of notice constitutes reversible error, and held that if it is found that the trial judge erred in overruling a defendant's motion to quash, "the next step is to decide whether, in the context of the case, this had an impact on the defendant's ability to prepare a defense, and, finally, how great an impact." (903).

Given the fact that it is not claimed by appellant that what was presented at the second trial differed substantially from what was presented at the first trial, we cannot conclude that the omission of the name of the victim of the aggravated robbery had any substantial impact on appellant's ability to prepare his defense in this cause.

Appellant's seventeenth point of error is overruled.

■ Appellant asserts in his third point of error that "The trial court erred in permitting the prosecutor to identify himself before members of the jury panel as representing the family of the victim." We agree with appellant but for reasons we will give cannot conclude that the error was so egregious that it denied appellant a fair trial.

Members of the jury panel were informed by the prosecutors that they would be representing the State of Texas *"and the family of A.C. Wilkins in the prosecution—"*; that "the law doesn't put the burden on the family to hire an individual attorney, the burden falls on the District Attorney's Office." (Our emphasis.)

■ In its reply brief, the State appears to argue that appellant failed to perfect the claimed error. We disagree. The record clearly reflects that appellant's trial attorney timely and properly objected many times to the statements and each time the trial judge overruled the objection. Counsel then concluded that to further object would have been a fruitless endeavor, which the record makes clear it would have. The State's claim that the error was not perfected is overruled. To require a defense attorney to repeatedly object, after the record makes clear that the trial judge's ruling is, so to speak, written in stone, would place an unwarranted burden on his shoulders. We decline to place such a burden on defense counsel. The State also claims that "The trial court properly overruled the appellant's objection, since it is common knowledge that the District Attorney's Office represents the State of Texas and society. See *Milo v. State*, 214 S.W.2d 618 (Tex.Cr.App.1948). Certainly, the complainant's family is a part of society and the State of Texas. Thus, the prosecutor can properly cite his representation of society, i.e. people, and the State of Texas."

We have "seen" *Milo v. State*, supra, and find that this Court only expressly

approved the prosecutor's statements that "I represent society. I represent the State of Texas", because such "is common knowledge", but did not expressly approve such statements as "I represent *you* ... I am *your* representative," (Our emphasis), as occurred here.

We have not yet found a case precisely in point to what the prosecuting attorneys told the panel members and the jury.

Based upon the record we infer that the trial judge's reasoning in overruling appellant's objection was that because Article 2.01, V.A.C.C.P., provides in part that the "district attorney shall represent the State in all criminal cases", and, because the statute does not "say who [specifically] they represent," the statute was surely meant to include *all* persons of this State; thus, *ipso facto*, the prosecuting attorneys in this cause could properly advise the panel members that they represented the family of the deceased in the prosecution of this case and that the law did not require the family to go and employ private counsel because that burden fell on the District Attorney's Office. We find that such reasoning is sophistry at its best.

Technically speaking, we cannot of course disagree with the trial judge's sophistic reasoning that he used to overrule appellant's trial attorney's objections to the prosecuting attorneys' remarks. Notwithstanding our agreement, we find that the statements of the prosecuting attorneys actually amount to a conscious distortion of what is in fact the truth, that in this instance they only represented the State of Texas in the prosecution of appellant and did not in fact privately or otherwise represent the deceased's family, which the panel members and the jury that was selected

could have easily inferred from the statements that were made.[2]

One of the duties of a prosecuting attorney in a criminal case in this State, no matter how repulsive the accused person may be to him, is to deal justly and fairly with that person, and he should never let his zeal get the better of his judgment. See, for example, *Bullington v. State*, 78 Tex.Cr.R. 187, 180 S.W. 679 (1915). Thus, "the prosecuting attorney must assume the position of an impartial representative of justice, not that of counsel for the complainant. The obligation of a prosecutor to protect accused persons from wrongful conviction is as binding as his duty to enforce the law." 21 *Tex.Jur.3rd* § 1438 at page 22.

■ A prosecuting attorney who conducts his voir dire examination or argues to the jury in a wrongful manner always errs and a trial judge who permits such to occur over objection also errs, and such may cause an appellate court to reverse a hard earned conviction of a defendant. See the cases compiled in *Erisman's Reversible Errors in Texas Criminal Cases* (1986 edition), § 16.06.

The prosecuting attorneys in this cause, by making the above statements that they represented the family of the deceased, clearly erred and the trial judge also clearly erred in overruling appellant's trial attorney's objections to the statements.

■ The issue, as we view it, is not whether error was committed, but, instead, is whether the error rose to the level of reversible error. We are constrained to hold that it did not.

---

2. It is axiomatic in Texas that a private citizen cannot and does not prosecute another person for a criminal wrong; it is the State of Texas, through its representatives, which initiates and prosecutes persons accused of committing criminal wrongs. If we accepted the prosecuting attorneys' above statements as being literally truthful, which we don't, their statements could perhaps also amount, not just to improper voir dire examination but to violations of possibly at least one-half of the Code of Professional Responsibility that governs licensed attorneys of this State. See and compare, for example, the

reported case in the March, 1985 *Texas Bar Journal* of a former district attorney who was suspended for six months from the practice of law after it was found that he shared fees from the settlement of a civil lawsuit in which he had an interest, which involved the same defendant which he had prosecuted when he was the district attorney. The former district attorney was also found guilty of unethical conduct after it was found that he had used his position as district attorney to collect money from another defendant in another civil matter by continuing criminal prosecution of the same defendant.

Appellant argues: "The jury was sure to feel much more sympathetic toward the side representing the family of a deceased person, particularly, as in this case, when the family actually appeared to testify, although only on identification, to lend credibility to the prosecutor's representation."

The record reflects that the widow of the deceased only testified to the following facts: that she and the deceased had been married for 25 years; that they had met in Harris County; that they had four children; that the deceased had been employed full-time at a cleaning establishment for approximately 25 years and also did part-time work for a security company in his capacity as a reserve deputy constable of Harris County, working at different places, such as schools and night clubs; that he had been a reserve deputy constable for approximately 17 years; that she last saw her husband alive at approximately 6:00 p.m. on the day in question when he left to work a part-time security job at the Stock Exchange Club where he was later shot; that he was in his reserve deputy constable's uniform at that time; that she next saw her husband at Ben Taub Hospital, when he was then dead; and that she identified her husband's pistol.[3]

Given the above extremely limited testimony of the deceased's family, which we do not find was given in an emotional manner, and the normal sympathy that a rational juror might have for the family of the deceased, we cannot conclude that the prosecutors' above remarks that were made were of such a nature that there is a reasonable possibility that they would have influenced him in arriving at his decision to convict appellant of capital murder or answer the special issues in the affirmative. We find that what this Court stated in *Brown v. State*, 171 Tex.Cr.R. 692, 353 S.W.2d 425 (1961), that "Language which may be objectionable may be so illogical, fanciful or extravagant as to require the conclusion that it could not have influenced the jury in arriving at their verdict, (citations omitted.)" (430), applicable to the im-

proper remarks that the prosecuting attorneys made in this cause. Although we find that the prosecutors' remarks were extremely improper, and remarks that the prosecuting attorney represents the family of the deceased in the prosecution of the accused should never again be uttered by any prosecuting attorney of this State in a court of law of this State, nevertheless, we cannot conclude that they were of such a nature as to have deprived appellant of a fair and impartial trial.

We are constrained to overrule appellant's third point of error.

Appellant claims in his fifth point of error that "The trial court erred in denying Appellant's challenge for cause to venire[person] Margaret Route, who was later excused by the defense [through the use of a peremptory strike]." We cannot agree with appellant that the trial judge erred in denying appellant's challenge for cause to venireperson Route.

The record reflects that venireperson Route initially told the trial judge that she had no opposition to the imposition of death as punishment for a crime, "Well, during my adult life I have come to the conclusion that the death penalty is effective if a person has taken another person's life deliberately ... [and that her views were based upon] more or less the way that she was reared, her moral convictions". Route later stated that her views on the death penalty were "Strong", but such views would not affect her in fairly and impartially answering the special issues, see Art. 37.071, supra, which she stated she would answer based solely upon the evidence presented. One of the prosecutors then questioned Route. Route appears to have answered the prosecutor's questions in a satisfactory manner to him. One of defense counsel then questioned Route. When questioned about the "deliberateness" issue, see special issue number one, Art. 37.071, supra, Route first stated that if she found a person guilty of capital

---

**3.** Without objection, one of the deceased's sons also testified but in testifying he only identified photographs of his deceased father.

murder she would automatically answer that issue in the affirmative. She also testified that she could not "think" of any factual situation that would call for a negative answer in that event. Route also told counsel that if she found that the defendant "was a threat to society, I'm afraid that I wouldn't go along with probation." It is obvious to us from the record that in giving this latter answer Route confused the finding that the defendant was guilty of the lesser included offense of murder with the finding that the defendant was guilty of capital murder, in which instance the jury could not, under any circumstances, either consider or recommend probation, and neither the prosecutor, defense counsel, nor the trial judge ever appear to have clarified this distinction for her. Soon thereafter, appellant's counsel challenged Route for cause, "in her responses as to whether she could ever answer Issue Number One no in any circumstance and her response was that she could not ever do that if she had found someone guilty." The prosecutor then further questioned Route, during which she stated that she would answer the first special issue "depending upon the evidence ... It depends on the evidence", and that she would not automatically answer the special issue in the affirmative if she found the defendant guilty of capital murder because her answer would depend on "The evidence." Soon after being asked what we find to be very inarticulately phrased questions by the prosecutor, defense counsel, and the trial judge, the trial judge overruled defense counsel's challenge for cause to Route, after which counsel for appellant exercised one of his peremptory strikes.

In making the determination whether the trial judge erred in overruling appellant's challenge for cause, we quickly point out that appellant is not claiming that the trial judge erroneously sustained a State's challenge for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), but is claiming that venireperson Route was subject to a challenge for cause pursuant to the provisions of Article 35.16(c)(2), V.A.C. C.P., which provides that a challenge for

cause may be made by the defense if it is established that the venireperson "has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor." A prospective juror who unequivocally demonstrates an inability to fairly and impartially answer the special issues submitted pursuant to the provisions of Art. 37.071, supra, like a prospective venireperson who demonstrates an inability to consider the full range of punishment for the lesser included offense of murder, see, for example, *Barrow v. State*, 688 S.W.2d 860, 863 (Tex.Cr.App.1985); *Holloway v. State*, 691 S.W.2d 608 (Tex.Cr.App.1984); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976), or is shown to have an inability to consider life imprisonment as punishment for the offense of capital murder, see *Smith v. State*, 573 S.W.2d 763 (Tex.Cr.App.1977); *Cuevas v. State*, 575 S.W.2d 543 (Tex.Cr. App.1978), is subject to a challenge for cause by the accused.

Viewing the totality of Route's voir dire, we are unable to conclude that she ever unequivocally demonstrated that she would always automatically answer special issue number one in the affirmative if she first found a defendant guilty of capital murder. The record also reflects that appellant did not exercise all of his peremptory strikes.

Appellant's fifth point of error is overruled.

Appellant claims in his fourth point of error that "The trial court erred in permitting one of the prosecutors to state that when the punishment question talks about society it includes prison society." It is highly questionable that appellant properly perfected this point for review. Therefore, without deciding whether the error was perfected, we will assume for argument purposes that it was.

A juror in a Texas capital murder case is required to make the determination, if he finds the defendant guilty of capital murder, whether there is a probability that

the defendant would commit criminal acts of violence that would constitute a continuing threat to *society.* See Art. 37.071(b)(2), supra. The term "society" is not defined in the Penal Code or in the Code of Criminal Procedure; thus, the juror is free to give it the meaning that is ordinarily acceptable in common language. See *Heckert v. State,* 612 S.W.2d 549 (Tex.Cr.App.1981). As to what the term "society" actually means, we find that such is usually dependent upon the context in which the word is used. In 39 *Words and Phrases,* under the term "society", the following is written at page 556:

> Bodies politic and corporate have 'been known to exist as far back at least as the time of Cicero, and Gauis traces them even to the laws of Solon of Athens, who lived some 500 years before. Pothier's Pand. of Just. bk. 3, p. 109 (Paris Ed. 1823). These associated bodies or communities of individuals ·with certain rights and privileges belonging to them by law in their aggregative capacity were styled by the Romans 'collegium,' and sometime 'universitas' as 'collegia ticicinum,' 'collegia aurificum,' 'collegia architectorum,' or society, corporation, or community of flute players, goldsmiths, architects, etc. Id. bk. 20, p. 110. The term is used by one of the Roman consuls to describe the nature of such a corporation or associated body of individuals under the laws of the republic is perhaps as appropriate as any general language can be used to describe a corporate aggregate at the present day, without referring to the specific object for which any particular corporation is organized. 'But those who are permitted to form themselves into a body under the name of a 'corporation,' 'society,' or other community, have within their peculiar jurisdiction, as in the similar case of the republic, property in common and a common chest or treasury, and an agent or head of the corporation or society, by whom, as in the republic, whatever is necessary to be done for the benefit of the community may be transacted. Dig. lib. 3, tit. 4a. And from time immemorial, as at the present day, this privilege of being a corporation or artificial body of individuals, with power of holding their property, rights, and immunities in common, as a legally organized body, and of transmitting the same in such body by an artificial succession, different from the natural succession of the property of individuals, has been considered a franchise, which could not be lawfully assumed by any associated body without a special authority for that power, from the government or sovereign power.' *Warner v. Beers,* N.Y., 23 Wend. 103, 122.

In this instance, it is obvious to us that the prosecuting attorney, in questioning the prospective jurors on their understanding of the meaning of the term "society", as it pertained to special issue number two, was only attempting to learn whether they would exclude from "society" persons, both inmates and non-inmates, who happened to operate within the Texas Department of Corrections. By what we have stated, we find, contrary to appellant, *that* "society would also include the penitentiary" and that such was a proper subject of inquiry not only by the prosecuting attorneys but by defense counsel as well.

Our law provides that once the defendant has been found guilty of capital murder the jury is thereafter free to answer any of the special issues submitted either in the affirmative or in the negative. The jury must unanimously agree on an affirmative answer but only ten must agree on a negative answer. If the jury answers at least one of the special issues in the negative, or is unable to answer any issue, the trial judge shall assess punishment at life imprisonment. If all the issues are answered in the affirmative, the death penalty shall be assessed by the trial judge. See Art. 37.071, supra. Thus, in deciding what answers should be given, the jury makes weighty decisions. It is obvious to us that in deciding whether to answer the second special issue in the negative the jury would clearly focus its attention on the "society" that would exist for the defendant and *that* "society" would be the "society" that is within the Department of Corrections.

Appellant's fourth point of error is overruled.

Appellant contends in his sixth point of error that "The trial judge erred by excusing venireman James Smith on his own motion." We agree with appellant that the trial judge erred, but, given the state of the record, cannot agree with him that such error amounts to reversible error.

■ It is now axiomatic in our law that a trial judge should never sua sponte excuse a prospective venireperson from jury service unless that person is exempt under the law from serving as a juror, and claims his exemption, or the person is absolutely disqualified as a matter of law from serving as a juror. See, for example, *Goodman v. State*, 701 S.W.2d 850 (Tex.Cr.App. 1985); cf. *Holloway v. State*, supra.

■ The record reflects that after the trial judge had gone over with a "mini-panel" of venirepersons the issues that are set out in Art. 35.17, V.A.C.C.P., he then asked the panel as a whole whether any of them "had some commitment, such as maybe your wife or daughter is pregnant or going to have a baby next week or something of that nature *or if you have a plane ticket to go to Hawaii or something to that effect*, if you have something that is pressing that way, then I will listen to you out of order ..." (Our emphasis.) After this, venireperson James Smith approached the bench and told the trial judge that he had "a prepaid trip to Hong Kong that would interfere with his serving as a juror". Smith was then excused by the trial judge.

We have not found any authority in our law that authorized the trial judge in this cause excusing Smith from jury service on his own motion because Smith had "a prepaid trip to Hong Kong." This type excusal clearly requires the consent of the parties, and in this instance the consent of the parties was neither sought nor obtained by the trial judge. Also see and compare Art. 2120, V.A.C.S.

■ However, the record clearly reflects that appellant's counsel was present when the trial judge excused Smith and he did not object to such excusal. We hold

that the error was waived by appellant. See *Mays v. State*, 726 S.W.2d 937 (Tex.Cr. App.1986). Appellant's sixth point of error is overruled.

■ Appellant asserts in his second point of error that "The trial court erred in denying Appellant's request that the state be restricted from using data processing equipment to investigate the criminal background of defense witnesses." We disagree.

The record reflects that the trial judge overruled defense counsel's request that the trial judge order the State "not to inquire into or use what data process equipment they have to inquire into the criminal backgrounds of any witnesses that we might call also."

As is easily seen, appellant did not seek in his request to gain equal access to the Harris County computer system; he simply did not want the State to use the system to gain information about possible witnesses, either State or defense, assuming for argument purposes that the information was actually available to the State. Appellant merely argues under his point of error that "To permit the state instant verification of impeachment material, so they need not ask the standard, 'have you been convicted of a felony or a misdemeanor involving moral turpitude within the past ten years' question without knowing the answer, while the defense does not have that opportunity, effectively bolsters the state's witnesses or allows them to go improperly unimpeached, depending on defense counsel's philosophy. If he decides to ask the question without knowing the answer, and the answer is 'no', the defense has bolstered the state's witness. If he decides not to ask a question to which he does not know the answer, and avoids asking altogether, prior convictions may go unused. Without access to the same material at the same speed, the defense is harmed." (Page 7, appellant's brief.) There is, however, no evidence that the prosecuting attorneys in this cause had a computer system or a terminal to a computer system at their table in the courtroom that might

instantly display such witness information to them on the computer's screen.

Like the attorney who represents the State on appeal, we are also unaware of any authority that provides for the equalization of background resources for both parties. Furthermore, there is nothing in this record that might reflect or indicate that the information about which appellant alludes was actually on any computer in Harris County; was available to the State, assuming that it existed; or that the State had access to the complained of computer system or its terminals to obtain information on any witness.

In *Bolden v. State,* 634 S.W.2d 710, 712 (Tex.Cr.App.1982), this Court, relying upon *Redd v. State,* 578 S.W.2d 129 (Tex.Cr.App. 1979), rejected the defendant's complaint in that cause that the trial judge erred in denying his motion to discover from the prosecution the information that it allegedly kept that related to verdicts rendered in former trials by members of the jury panel because such did not constitute an abuse of the trial judge's discretion. Also see *Smith v. State,* 721 S.W.2d 844, 851 (Tex.Cr.App.1986). We find this holding applicable to this cause.

Appellant's second point of error is overruled.

■■■ Appellant contends in his eighth point of error that "The prosecutor [sic] committed error by calling appellant's common law wife to the stand before the jury." We interpret this contention to mean that the trial judge erred in permitting the prosecutor to call appellant's common law wife as a witness for the State. We disagree. We find that the trial judge may have erred in appellant's favor on this point.

The record reflects that when the State announced that it was calling one *Bernandine Norris* to the stand, which is all that the jury heard, appellant's counsel requested, which request was granted, that the jury be retired. A hearing was then held in order to determine whether Norris was, as a matter of law, appellant's common law wife.

At the hearing, Norris testified that she had known appellant "Maybe ten to twelve years"; that she established a "girlfriend-boyfriend" relationship with appellant; that she and appellant were never legally married; that, apparently except for one instance when she wrote appellant a letter while he was incarcerated, when she used his last name because "I felt that it wouldn't go through", she never used appellant's last name; that they never had a joint checking bank account; no credit card was ever issued to her with the last name of Rougeau stamped thereon; that she and appellant lived together for approximately five years, "We were sharing [my house]"; that they never told anyone, including her mother, that they were married; that she did not believe that she was appellant's common law wife "because I don't feel that way about it", and because "A marriage is when two people walk down the aisles and have papers", and she and appellant never walked down any aisle together with "papers in hand"; that she didn't believe she had married appellant, and she never considered herself to be married [to appellant]"; and that while appellant was incarcerated she wrote and visited with him.[4]

The trial judge sustained appellant's objection to Norris testifying for the State, "I'm not going to let her testify, ... but I'm not going to hold that she is not a competent witness." The record indicates that the jury never again heard from or saw Norris.

■■■ Based upon what Norris testified to at the hearing held outside the jury's

---

4. The record actually reflects that Norris twice testified outside the jury's presence. Chester Caesar, whose stepfather was "probably a distant cousin" to appellant, also testified on the issue whether appellant and Norris had a common law marriage. Caesar actually testified that appellant, but no one else, told him that he was married to Norris. No effort was made by either side to offer this testimony to the jury.

We find that if it had been offered and the State had objected, the State's objection would have been good as gold because it is obvious from Caesar's testimony that he did not know what constitutes the elements of a common law marriage, and was totally unqualified to voice an opinion or conclusion whether appellant and Norris were married.

presence, we find and hold that the trial judge erred in appellant's favor in not permitting Norris to testify for the State. A defendant who benefits from a trial judge's error committed in the trial court is hard pressed to claim on appeal that such error constitutes reversible error. Also see *Lackey v. State*, 638 S.W.2d 439 (Tex.Cr. App.1982).

Appellant's eighth point of error is overruled.

Appellant asserts in his eighteenth point of error that "The trial court erred in overruling Appellant's motion to suppress evidence because the warrant date is one year prior to the date of the offense." Appellant urges in his nineteenth point of error that "The trial court erred in denying Appellant's motion to suppress evidence, based on evidentiary hearings at the first and second trials." In his twentieth point of error, appellant claims that "The trial court erred in permitting Earl Campa to testify regarding the facts of the arrest of Appellant because the warrant was defective."

■■■ We find that the basis for appellant's complaints all rest on the fact that the arrest warrant, that was the basis of appellant's arrest, obviously through typographical error, was dated January 6, *1977*, rather than January 6, *1978*.

The record reflects that the arrest warrant was obtained on January 6, 1978, and Houston Police Officer Campa, pursuant to the warrant, arrested appellant on the same date.[5]

In *Lyons v. State*, 503 S.W.2d 254 (Tex. Cr.App.1973), this Court was confronted with and rejected the claim that because the affidavit for a search warrant was dated *July* 11, 1971, and executed on the same date, but because the warrant was dated *March* 11, 1971, the evidence seized pursuant to the execution of the search warrant should have been suppressed.

Based upon the testimony that was adduced concerning appellant's contention, we find and hold that the error pertaining to the year that was placed on the arrest warrant, 1977, was clearly a typographical error. This kind of error will not vitiate either an arrest or search warrant. Also see *Martinez v. State*, 162 Tex.Cr.R. 356, 285 S.W.2d 221 (1955); *Tyra v. State*, 496 S.W.2d 75 (Tex.Cr.App.1973); *Moreno v. State*, 170 Tex.Cr.R. 410, 341 S.W.2d 455 (1960).

Appellant's eighteenth, nineteenth, and twentieth points of error are overruled.

Appellant asserts in his tenth point of error that "The trial court erred in permitting witness Freeman to testify that Appellant refused permission to remove the bullet lodged in his body." In his eleventh point of error appellant claims that "The trial court erred in permitting the prosecutor to state during final argument that Appellant had refused permission to remove the bullet lodged in his body." If we find that appellant's tenth point of error is without merit, then it follows that his eleventh point of error is also without merit.

The record is clear that no bullet was ever removed from appellant's body. Thus, it is not necessary for us to discuss under what circumstances the State has the right to have surgery performed on an accused in order to obtain possible tangible, incriminatory evidence from inside his body. See and compare *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). Also see *People v. Scott*, 21 Cal.3d 284, 145 Cal.Rptr. 876, 578 P.2d 123 (1978).

We do observe, however, that in *Webb v. State*, 467 S.W.2d 449 (Tex.Cr.App.1971), this Court rejected the defendant's contention that, although *he had consented to surgery*, when he was then in custody in a hospital, during which he had a police guard stationed with him at all times, testimony going to a bullet that had been removed from his body was inadmissible evidence because he had not been warned by

---

**5.** Appellant complains in his seventh point of error that "The trial court erred in permitting the testimony of Officer D.W. Howell over objection by defense counsel." Given the fact that Campa previously testified, without objection, that appellant was taken to Ben Taub General Hospital for treatment, after he was arrested, appellant either waived this error, if it is error, which we do not decide, or the error, if it is error, is harmless beyond a reasonable doubt.

the surgeon who performed the operation that he might turn the bullet over to police and that the police might later use the bullet to establish that it had been fired from the weapon of the deceased. This Court also rejected the defendant Webb's contention that the removal of the bullet was a violation of his Fifth Amendment right against self-incrimination.

The evidence adduced in this cause established that the alleged aggravated robbery and killing of Wilkins occurred on the night of January 5, 1978 at the Stock Exchange Club in Houston and the robbery was committed by appellant, his brother Joe, and Curtis Gillory, each of whom frequently patronized the place, but were then wearing ski-masks when the aggravated robbery and shooting of Wilkins occurred. Pursuant to a plea bargain agreement, Gillory received 40 years as his punishment for his participation in the crimes that were committed. Gillory testified for the State.

The evidence presented at trial also reflects that after the appellant, his brother, and Gillory exited the club, shoot-outs with the police occurred, although they did not occur at the same time. Joe was killed, appellant managed to escape, and Gillory was arrested outside of the establishment. Testimony was also adduced that appellant might have been wounded by the police. When appellant was arrested by the police the next day, January 6th, the police officers, by observing blood around the buttocks area of appellant's body, concluded that appellant had previously sustained a wound to that area of the body. Appellant was thereafter taken by the police to the emergency room at Ben Taub General Hospital in Houston for emergency treatment. Dr. Ralph Freedman testified that a team of doctors, which included himself, treated appellant and took x-rays of the buttocks area of his body, which revealed "a metallic fragment that appeared to be a bullet", "entered via the right buttocks and apparently hit the ischial tuberosity, which is a bone that makes up the pelvic compartment and caused a small fracture of that ramus." Over objection, Dr. Freedman testified that he requested permission from appellant to remove the bullet but appellant refused to give his consent to remove the bullet. The details of the conversation that Dr. Freedman had with appellant were not divulged before the jury.

We have yet to find any specific objection to Dr. Freedman's testimony, such as it constituted an oral statement that was inadmissible because of the failure of the police to comply with the provisions of Article 38.22, V.A.C.C.P., or some other specific reason.

We first observe that, standing alone, appellant's refusal to consent to the removal of the bullet did not constitute incriminatory evidence, although we admit in making this statement that an incriminatory inference could possibly be drawn.

We next observe that there is absolutely no evidence in this record that might reflect or indicate that when appellant told Dr. Freedman that he refused to consent to the removal of the bullet, Dr. Freedman was then acting as an agent of the State, compare *McCrory v. State*, 643 S.W.2d 725 (Tex.Cr.App.1982), or that when Dr. Freedman sought appellant's consent to remove the bullet that he was then acting at the behest of the police, who then had custody of appellant, or that he was acting deceptively as occurred in *Graves v. Beto*, 424 F.2d 524 (5th Cir.1970). We also cannot find any testimony which might reflect or indicate that when Dr. Freedman sought appellant's consent any police officers were actually then present. The record clearly reflects that Dr. Freedman was then acting only in the capacity of appellant's treating physician, and appellant's objection did not invoke the physician-patient privilege, see former Art. 4495b, § 5.08, V.A.C.C.P. (Today, it is expressly provided by Rule 509 of the Rules of Criminal Evidence that there "is no physician-patient privilege in criminal proceedings"). Our research has yet to reveal a single case where this Court has ever held that there is a physician-patient privilege in a criminal case. See and compare *Blunt v. State*, 724 S.W.2d 79 (Tex.Cr. App.1987). Nor do we find where it could be argued that Dr. Freedman was then acting pursuant to any type of court order. See *Estelle v. Smith*, 451 U.S. 454, 101

S.Ct. 1866, 68 L.Ed.2d 359 (1981). Also see *Mulder v. State,* 707 S.W.2d 908 (Tex.Cr. App.1986), and *Winston v. Lee,* supra.

■ We find that appellant is actually arguing that when one has been arrested and is in the general custody of the police, then any statements that that person might make to anyone other than a police officer, in response to questions, may not be admitted at the defendant's trial.

Appellant does not cite us to any specific authority that might support this novel proposition of law, nor has our research yet to reveal a case directly in point.

■ Our research has also failed to reveal any authority, given the setting when the appellant was requested by Dr. Freedman to consent to the surgical removal of the bullet from his buttocks and he refused to give his consent, that might support the holding that Dr. Freedman's questioning appellant amounted to "custodial interrogation" under the Fifth Amendment to the federal constitution, necessitating the giving of a legal warning by Dr. Freedman that his refusal to consent to the surgery could be used against him in a court of law. If anything, we find that the issue appellant attempts to raise might implicate the Fourth Amendment, which appellant does not claim is involved in this case. We hold that Dr. Freedman's testimony was admissible. Given this holding, it was proper for the prosecuting attorney to comment on same during his jury argument. Compare *Garcia v. State,* 103 N.M. 713, 712 P.2d 1375 (1986).

Appellant's tenth and eleventh points of error are overruled.

Appellant asserts in his fourteenth point of error that "The trial court erred in overruling Appellant's pro se motion to dismiss for denial of a speedy trial."

Even though a majority of this Court held in *Meshell v. State,* 739 S.W.2d 246 (Tex.Cr.App.1987), that the Speedy Trial Act was unconstitutional, that decision is not yet final. Therefore, we will address appellant's point of error.

The record reflects that after this Court reversed appellant's conviction on December 22, 1982, its mandate issued on January 7, 1983. On January 31, 1983, the trial judge appointed two attorneys to represent appellant on the retrial and they continuously represented appellant until after his case was placed on appeal, when the trial judge appointed appellant's present attorney to represent him on his appeal.

On June 24, 1983, while represented by his two court appointed attorneys, appellant filed a pro se motion to dismiss for failure of the State to grant him a speedy trial pursuant to the provisions of Art. 32A.02, V.A.C.C.P. We do not find where the trial judge ever ruled on this motion. On September 15, 1983, appellant filed a pro se application for writ of habeas corpus with the trial court in which he asserted therein, inter alia, that he was being unlawfully restrained of his liberty because the State had failed to comply with the Speedy Trial Act. On September 23, 1983, for reasons not reflected in this record, rather than take up the application in conjunction with the motion to dismiss when he was going to consider the other motions on October 3rd, the trial judge conducted a hearing on the application for writ of habeas corpus and thereafter denied same on September 23rd. Appellant appealed the denial to the Houston First Court of Appeals. Based upon several of this Court's decisions and one of its own, the Houston First Court of Appeals dismissed the appeal. We cannot find where the matter was further pursued.

On October 3, 1983, the trial court considered and either granted or denied appellant's pretrial motions that were urged at that time. We cannot find any reference whatsoever to the above motion to dismiss for failure of the State to comply with the Speedy Trial Act.

■ Given the fact that the trial judge never ruled on appellant's pro se motion to dismiss, and the fact that appellant never sought review by this Court or the Houston First Court's decision dismissing the writ appeal, the issue is not properly before us for review.

However, even if it was properly before us for review, we would be compelled to reject the point of error on the ground that in Texas a defendant has the right to represent himself or to be represented by either retained or court appointed counsel, but does not have the absolute right to hybrid representation. See, for example, *Landers v. State*, 550 S.W.2d 272, 275–280 (Tex.Cr.App.1977), also see *Mc Kaskle v. Wiggins*, 465 U.S. 168, 183–184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), and *Rudd v. State*, 616 S.W.2d 623 (Tex.Cr. App.1981). In this instance we do not find where appellant ever sought or was granted permission either to represent himself or to be "co-counsel" with his court appointed attorneys.

We have nevertheless carefully reviewed appellant's point of error and find it to be without merit because when the time resulting from the agreed resettings by trial counsel, who we find were then acting on behalf of appellant, is excluded, the appellant's trial commenced well within the 120–day statutory Speedy Trial Act requirements. See *Orellana v. State*, 706 S.W.2d 660 (Tex.Cr.App.1986), and *Robinson v. State*, 707 S.W.2d 47 (Tex.Cr.App. 1986).

Appellant's fourteenth point of error is overruled.

Appellant asserts in his ninth point of error that "The trial court erred in admitting the blood sample test results because the witness [Houston police chemist and toxicologist Robert Warkentin] could not testify from whence they came." We disagree.

The record reflects that Houston Police Officers Bostock and Shields collected in the vicinity of the scene of the criminal wrongs a Schlitz beer can, some plastic strips, weeds that had what appeared to be blood on them, and, using cotton swabs, soaked up what appeared to be blood that was on a concrete slab behind the club. These items were turned over to Houston Police Officer Robert Warkentin, who is also a chemist and toxicologist.

Warkentin testified that he analyzed some of these exhibits, which were shown to contain type A positive blood which matched appellant's blood type, after which he turned them over to an assistant district attorney, who could not recall receiving them.

Appellant argues that "Where there is no evidence connecting the testimony of the expert, here, the chemist, with the material analyzed, the admission of the test results is error." Given the state of the record, we must disagree with appellant.

It appears that after appellant's first trial, see footnote 1, *ante*, the exhibits were lost and, although a diligent search was made, could not be found. There is no claim by appellant, however, that the State purposefully caused the exhibits to be lost with an eye to harming appellant's retrial, nor is there any claim by appellant that the State ever acted in bad faith concerning the loss of the exhibits, nor does appellant contend that the analysis that Warkentin made was improper or incorrect, nor does he actually claim that there has not been a showing of the chain of custody. Both Warkentin and the police officers testified and were subjected to cross-examination by appellant at his retrial.

Given the above, we find and hold that appellant's contention is without merit. See and compare *Lake v. State*, 577 S.W.2d 245 (Tex.Cr.App.1979). We have examined appellant's authorities and find them to be patently distinguishable.

Appellant's ninth point of error is overruled.

Appellant claims in his first point of error that "The trial court erred in overruling [his] motion for mistrial when witness Robinson referred to the prior trial of this case before the jury."

The record reflects that Wesley Robinson, the manager of the Stock Exchange Club, who was an eye-witness to portions of the offenses that were committed inside of the club, responded to the following question asked by one of appellant's trial attorneys, "Q: Do you remember ever having made a statement saying that both

people were firing pistols that evening there on the 6th of January of 1978?'', in the following way: "A: Yes, sir. You asked me that question in the last trial." Thereafter, outside the presence of the jury, the trial judge admonished the witness not to "volunteer too much" when answering the questions. After the jury returned to the courtroom, the trial judge instructed it to disregard the above answer and overruled appellant's motion for mistrial.

In *Rogers v. State*, 168 Tex.Cr.R. 148, 324 S.W.2d 10 (1959), a majority of this Court stated the following: "[W]e are aware of no authority requiring that a mistrial be declared because a witness, in fixing the time of an event inquired about, mentioned that the defendant was granted a new trial. *Coffman v. State*, 73 Tex. Cr.R. 295, 165 S.W. 939, and *Smith v. State*, 52 Tex.Cr.R. 344, 351, 106 S.W. 1161, 1165, cited by the State, are contrary to appellant's contention." (14). In *Smith v. State*, supra, this Court pointed out that "a mere and casual reference or incidental allusion to the former conviction will not necessarily afford cause for reversal." (1165). Also see *Gibson v. State*, 726 S.W.2d 129 (Tex.Cr.App.1987).

■ We find that the trial judge's instruction to the jury to disregard the answer of the witness was sufficient to cure any error. Also see *Williams v. State*, 643 S.W.2d 136, 138 (Tex.Cr.App.1982), and the many cases collated under *West' Criminal Law Key* 1169.5(3), regarding the fact that as a general proposition this kind of error will usually be cured by a prompt instruction to the jury to disregard the answer.

Appellant's first point of error is overruled.

Appellant asserts in his twelfth point of error that "The trial court erred in permitting witness Wesley Warner to testify on punishment because his mere appearance demonstrated that Appellant had been in custody", and in his thirteenth point of error he asserts that "The trial court erred in permitting witness Wesley Warner to testify because his testimony demonstrated that Appellant had been previously convicted in another trial of this cause."

The record reflects that over objection Wesley Warner, who was then the Assistant Warden of the Ellis Unit of the Department of Corrections, testified that appellant had a reputation for not being a peaceable and law abiding person. Warner, however, did not testify that appellant had been previously convicted or that he was then serving any kind of sentence at the Ellis Unit.

Mark Dawson, who was then employed in the Security Division of the Department of Corrections at the Ellis Unit, testified without objection that he once had the care, custody and control of appellant at the Ellis Unit during which time he and appellant had an altercation when he moved appellant from one cell to another cell that was located in the "Administration Segregation" area of the Ellis Unit.

There was also testimony from Harris County Sheriff's Department personnel and one inmate of the Harris County Rehabilitation Center concerning appellant's stay at that location. This, too, was admitted mostly without objection.

Without any qualification, appellant called two inmates who were housed at the Ellis Unit when he was there to testify concerning the above altercation he had had with Dawson.

Given the above, it is highly questionable whether appellant's complaints are properly before us for review. Nevertheless, given the fact that appellant has been assessed the death penalty, we will review them.

■ We first point out that a witness may give whatever position or title he might occupy or hold in civilian life, because a proper preliminary inquiry into the background of the witness can be established in order to allow the jury to assess the weight to be given his testimony and to evaluate his credibility. See, for example, *Carrillo v. State*, 566 S.W.2d 902, 916 (Tex. Cr.App.1978) (Held, permissible for a witness to testify that he was an investigator

for the Organized Crime Division of the Attorney General's Office).

We next point out that Art. 37.071, supra, expressly provides that "evidence may be presented as to any matter that the court deems relevant to sentence." Thus, the trial court has broad discretion in determining what constitutes relevant evidence for the purpose of the punishment hearing. See, for example, *Robinson v. State,* 548 S.W.2d 63 (Tex.Cr.App.1977). However, the discretion in determining relevance does not supersede the rules of evidence regarding the manner of proof. See *Esquivel v. State,* 595 S.W.2d 516 (Tex.Cr.App.1980).

This Court has long held that evidence of a defendant's reputation is admissible at the punishment stage of a capital murder case. See, for example, *Smith v. State,* 437 S.W.2d 835 (Tex.Cr.App.1968); *Mitchell v. State,* 524 S.W.2d 510 (Tex.Cr.App.1975); and *Davis v. State,* 597 S.W.2d 358 (Tex.Cr.App.1980).

In *Demouchette v. State,* 591 S.W.2d 488 (Tex.Cr.App.1979), it was implicitly held that testimony of three wardens from the Department of Corrections could be particularly probative of the special issues which would determine whether the defendant in that cause would be sentenced to life imprisonment or death. See, however, *Jordan v. State,* 635 S.W.2d 522 (Tex.Cr.App.1982) (Clinton, J., concurring opinion.)

We find that Warner's reputation testimony was clearly relevant and thus admissible.

Appellant's twelfth point of error is overruled. We overrule appellant's thirteenth point of error because there is no evidence that the jury was made aware through Warner's testimony that he, appellant, had been previously convicted in another trial for the offense for which he was convicted in this cause.

Appellant asserts in his sixteenth point of error that "The trial court erred in overruling Appellant's amended motion for new trial based on newly discovered evidence known to the prosecutor at the time of trial and not conveyed to the defense, despite its exculpatory nature."

We find that the gist of appellant's complaint lies in the fact that when Dawson testified, see *ante,* one of appellant's attorneys was then unaware that Dawson had been suspended by the Department of Corrections, which suspension apparently occurred because of improper altercations that he had had with inmates other than appellant. However, appellant's other counsel was aware of the suspension, apparently having learned this from one of the inmates from the Ellis Unit who had testified for appellant at the punishment hearing, but declined to use this information at that time because "[We, the attorneys,] wanted to get that part of the trial over with as quickly as possible."

One of the prosecutors testified at the motion for new trial hearing that he was aware of Dawson's suspension when Dawson testified but did not convey this information to both of appellant's attorneys because "it was only impeachment evidence that would go to an incident totally unrelated to Paul Rougeau."

The record makes it clear that both of appellant's attorneys were aware that Dawson was going to testify for the State at the punishment stage of the trial in the event appellant was found guilty of capital murder.

We agree with the attorney who represents the State on appeal that because at least one of appellant's attorneys was aware of Dawson's suspension before the jury had returned their answers to the special issues, which, if admissible, would have only been impeaching evidence, there was no error and the trial judge did not err in overruling appellant's motion for new trial. *Bolden v. State,* 634 S.W.2d 710, 711–712 (Tex.Cr.App.1982); *Myers v. State,* 527 S.W.2d 307, 309 (Tex.Cr.App.1975).

Appellant's sixteenth point of error is overruled.

Appellant argues in his fifteenth point of error that "The trial court erred in denying Appellant's motion for mistrial when the

prosecutor argued the defendant's failure to testify on punishment."

■ Appellant's complaint is directed to the statement "What evidence have you heard except that his [appellant's] reputation is bad" that one of the prosecutors made after the punishment hearing had been held in this cause. Although this statement is absolutely correct, the cautious trial judge nevertheless sustained appellant's counsel's objection, instructed the jury to disregard the statement, but overruled counsel's motion for a mistrial. The prosecutor then stated, "You know what I am talking about", to which counsel again objected, the trial judge again instructed the jury to disregard that statement, but again overruled counsel's motion for a mistrial. Previously, without objection, the prosecutor had stated that "The law allows you to hear evidence that his [referring to appellant] reputation is good, too." This statement is a correct statement of the law. Appellant, nevertheless, asserts that the above comments constitute impermissible comment on his failure to testify.

■ We cannot agree with appellant's attorney on appeal that the above statements violated the provisions of Article 38.08, V.A.C.C.P., which prohibits a prosecuting attorney from alluding to or commenting on a defendant's failure to testify. In any event, we find that the trial court's prompt instructions to the jury to disregard the statements the prosecutor made were sufficient to remove any error.

Appellant's fifteenth point of error is overruled.

Having reviewed all of appellant' points of error, and finding that none contain reversible error, we affirm the trial court's judgment of conviction and sentence of death.

CLINTON, McCORMICK, CAMPBELL and DUNCAN, JJ., concur in the result.